AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA K.M.Copeland/C.P.Pozos)                                     17-126

# UNITED STATES DISTRICT COURT
for the

Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br><br>STEPHEN DAVID STROH<br><br>*Defendant(s)* | )<br>)<br>)  Case No.  17- 1685 - M<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  spring 2017 to December 23, 2017  in the county of  Delaware  in the Eastern District of  Pennsylvania , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Knowingly and intentionally conspiring to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a mixture and substance containing methamphetamine, Schedule II controlled substances, and other controlled substances |

This criminal complaint is based on these facts:

From in or about the spring of 2017, to on or about December 23, 2017, in Clifton Heights, in the Eastern District of Pennsylvania, defendant STROH knowingly and intentionally conspired to distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a mixture and substance containing methamphetamine, Schedule II controlled substances, and other controlled substances, in violation of 21 U.S.C. § 841 (a)(1)(A), (b)(1)(A), (C), all in violation of 21 U.S.C. § 846.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

HSI Special Agent William Capra
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  December 26, 2017

_____
*Judge's signature*

City and state:  Philadelphia, Pennsylvania             HONORABLE JACOB P. HART
*Printed name and title*

17-1685 M

Affidavit in support of a criminal complaint

William Capra, being duly sworn, states as follows:

1. I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed since November 2006. Prior to my employment as a Special Agent, I was an Officer with Customs and Border Protection ("CBP"), from October 2004 to November 2006. I have been employed as a federal law enforcement officer for more than thirteen years. Since becoming a Special Agent, I have participated in numerous investigations into suspected international narcotics trafficking and money laundering. I am currently assigned to the Philadelphia Special Agent in Charge HSI Office, Cybercrimes Group. Prior to my current duty location, I was assigned to the Pittsburgh Assistant Special Agent in Charge HSI Office, Contraband Smuggling Group.

2. I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code and other related offenses.

3. I am responsible for investigations focusing on the importation and distribution of narcotics by international organizations operating in foreign countries and the United States. I am cross-designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the U.S. Drug Enforcement Administration and Immigration and Customs Enforcement ("ICE"). As a law enforcement officer, I have participated in numerous searches and arrests, debriefings of criminal defendants and confidential sources, initiation and monitoring of pen registers and trap and trace devices, and monitoring of authorized wire communication intercepts. As such, I am familiar with the operation of illegal drug trafficking organizations, and the methods used to import and distribute narcotics and launder the proceeds.

4. In addition to my investigative experience, I have successfully completed the following trainings: Customs and Border Protection Integrated Basic Academy, Criminal Investigator Training Program, ICE Special Agent Training, Conducting Title III Intercepts, Asset Identification and Removal Group/Financial Investigations, Designated Technical Agent, HIDTA Dark Web, Department of Justice's Complex Computer Seminar and HSI's Virtual Currency and Online Undercover Investigations trainings. I am adjunct instructor at the Federal Law Enforcement Academy and I have graduated from ICE'S Instructor Development Course. Lastly, I have earned a Bachelor's degree in Law Justice Studies, with a minor in Business Administration, from Rowan University in Glassboro, New Jersey in December 2001.

5. The information contained in this affidavit is based on my personal observations, my training and information provided by other law enforcement officers and/or agents. This affidavit sets forth only those material facts that I believe are necessary to establish

probable cause to believe that from in or about the spring of 2017 to on or about December 23, 2017, Stephen David STROH and others conspired to distribute a mixture and substance containing 400 grams or more of fentanyl, a mixture and substance containing methamphetamine, Schedule II controlled substances, and other controlled substances, in violation Title 21, United States Code, Sections 841(a)(1) and 846.

## SPECIFIC PROBABLE CAUSE

6. On or about December 14, 2017, Customs and Border Protection (CBP) Officers working at John F. Kennedy International Airport (JFK) discovered approximately 435 grams of a white powdery substance that tested positive for the presence of fentanyl that was concealed in a United States Postal Service (USPS) mail parcel bearing USPS tracking number LS255746150CN. This parcel, hereinafter referred to as Subject Parcel #1, is further described as follows: United States Postal Service parcel bearing tracking number LS255746150CN, measuring 10 inches high by 6 inches deep by 10 inches long, shipped by "wei zhu" from "wei zhu, 18 / F, 458 Wuding Road, Jing'an District, Shanghai, SHANGHAISHAI SHANGHAI 200041, China," bearing the delivery name of COOPERATING DEFEDANT #1 (CD#1) and addressed to Subject Address #1.

7. On December 20, 2017, at approximately 11:00 AM, HSI special agents located CD#1 at the rear parking of the Walmart located in Elkton, Maryland. The agents informed CD#1 that they were investigating him for the importation of an international parcel containing fentanyl. Almost immediately, CD#1 informed the investigators that he would like to cooperate with law enforcement and consented to an interview. CD#1 was provided his Miranda warnings, waived the same, and agreed to speak with law enforcement. CD#1 informed the agents that he had two safes, each of which contained suspected illicit substances. CD#1 further advised that one of the safes contained an unopened parcel that he was supposed to deliver to another individual he identified as Vaughan REISER. The first safe was inside of Subject Address #2. The second safe was inside of Subject Address #1. CD#1 also consented to a search of his vehicle, mobile phone, and safes. Agents drove CD#1 to both his Subject Address #1 and Subject Address #2 to retrieve the safes containing the contraband.

8. CD#1 was then transported to the Delaware State Police Barracks in Delaware, for further questioning by law enforcement. CD#1 waived his Miranda rights again, and agreed to continue to speak with agents without an attorney and consented to the searching of the vehicle, phone, and safes.

9. CD#1 explained to the officers that he knew Vaughn REISER since the 6th or 7th grade and they smoked marijuana together. CD#1 advised that he considers REISER to be one of "his closest friends." CD#1 explained that a "bunch of his friends help with this," referring to the fact that REISER asked approximately ten of their friends to receive parcels at their homes but that two of them agreed to do so. Agents showed CD#1 a Pennsylvania driver's license photograph of Vaughan REISER from Landenberg, Pennsylvania, and he positively identified Vaughan REISER as the individual to whom he was referring.

2

10. CD#1 advised law enforcement that he has been working with REISER for about 1½ years, receiving at least approximately 150 parcels containing illegal controlled substances and pill presses. CD#1 advised that he provided REISER with addresses of various individuals close to him; REISER would then arrange for the parcels containing the controlled substances to be delivered to these locations. A check of law enforcement records of international shipments revealed that CD#1 has received international shipments of parcels at various locations that CD#1 had provided to REISER.

11. CD#1 advised that approximately 100 of these packages were sent to Subject Address #3 while the other 50 went to Subject Address #2's house. CD#1 advised that he recently provided Subject Address #1 to REISER so that REISER could send parcels to this location as well. Upon receiving these parcels, CD#1 would meet with REISER at various locations in Pennsylvania and Delaware and deliver the parcels to REISER. CD#1 advised that upon meeting with REISER to deliver the parcels of controlled substances, CD#1 would receive bulk quantities of marijuana and/or pills from REISER. CD#1 advised that prior to receiving parcels on REISER's behalf, CD#1 obtained bulk quantities of marijuana from REISER, which CD#1 smoked and distributed to others. Once CD#1 began receiving parcels on REISER's behalf, REISER began to provide marijuana as well as other controlled substances to CD#1 at a discounted price. CD#1 advised that at one point he complained to REISER about the volume of parcels REISER was sending to various locations provided to REISER; REISER then began to pay CD#1 $100 per parcel, which subsequently increased to $200, and then to $500.

12. Law enforcement showed CD#1 photographs of the items contained in a safe at Subject Address #1. Prior to searching this safe, CD#1 advised that there was an unopened parcel in the safe that he had received for REISER and he was waiting to receive additional parcels that were to be sent to his house before meeting and delivering the parcels to REISER. Upon looking at the photographs of the contents of the safe, CD#1 identified a sealed parcel that had been located inside the safe as the parcel he was supposed to deliver to REISER. This parcel is further described as follows: a domestic United States mail parcel bearing United States Postal Service tracking number 9261292700480017100986l344, measuring 10 inches high by 6 inches deep by 10 inches long, with a return address of "SF Express, c/o Worldnet Shipping USA Inc., 475 Doughty Blvd., Inwood, NY 11096," addressed to CD#1 at Subject Address #1 (hereinafter referred to as Subject Parcel #2). Law enforcement opened Subject Parcel #2 and found it to contain sealed silver foil bags that contained a powdery substance. Officers tested the contents of these sealed silver bags using the Tru-Narc device (which tests for the chemical components of suspected synthetic controlled substances) and it tested positive for fentanyl, weighting approximately 514 grams. On top of the parcel in the safe, law enforcement recovered four envelopes, each of which contained approximately 200 pills, for a total of approximately 800 pills. The pills weighed approximately 351.1 grams. CD#1 advised that he believed these pills were Xanax pills and that he was given these pills by REISER to sell/consume. The Tru-Narc was used to test these pills and the results were inconclusive. Lastly, approximately 80 orange pills were found in the safe, that were marked AD30, which CD#1 identified as Adderall pills

3

that he had obtained from REISER. The Tru-Narc determined that these orange pills tested positive for the presence of methamphetamine. Law enforcement also located identification documents for CD#1 inside the safe.

13. Law enforcement showed CD#1 photographs of the contents of the second safe that was located at Subject Address #2. Law enforcement located two envelopes containing pills in the safe; when shown the photograph of the envelopes and pills, CD#1 advised that there were approximately 750 Xanax pills in each envelope and that he had received these pills from REISER. The Tru-Narc was used to test the Xanax pills and the results were inconclusive. Additionally, seven bags of blue pills (each labeled "A215") were found in the safe. CD#1 estimated that there was a total of approximately 1,050 blue pills in these bags and that he had received these pills from REISER. The total weight of the blue pills was approximately 124.9 grams. CD#1 told the agents that he believed that the blue pills were likely counterfeit because they fell apart easily. The Tru-Narc was used to test a sampling of the blue pills and tested positive for cellulose (a non-controlled substance used to bind pills).

14. CD#1 told agents that he knows other individuals in Pennsylvania and Maryland who receive parcels suspected to contain illicit substances on behalf of REISER. Law enforcement checked databases that showed one of these had received international parcels shipments from China in August and September 2017. The true legal name of the second individual is currently unknown.

15. CD#1 advised law enforcement that a few months ago, he received an extremely heavy parcel for REISER. CD#1 believe that it was a "press" or "mixer." CD#1 looked inside that parcel, which was large, and observed what he believed to be a pill press or equipment used to manufacture pills. Law enforcement database records indicate that in June 2017, CD#1 received what was identified on the shipping manifest as a 357-pound drilling machine and in August 2017, CD#1 received what was identified on the shipping manifest as a 375-pound mixer. Both of these items had been sent from China and were received at Subject Address #2 in Maryland. CD#1 advised that both of these shipments has been sent to him by REISER and that he had to enlist the help of another person to transport and deliver these items to REISER.

16. CD#1 advised that REISER and his associates were selling substantial amounts of counterfeit pills. CD#1 stated that he knew the pills were "fake" and was concerned because the pills "kill people." CD#1 advised that he took one of the white Xanax pills he had obtained from REISER. CD#1 stated that upon doing so, "it put [him] on [his] ass for two days." He also said that he "would never try the blue pills."

17. In conversation with CD#1, REISER has intimated that an individual he referred to as "HEISENBERG" was involved in the pill production process. Your affiant knows that the name HEISENBERG is a fictional character in the television series Breaking Bad. HEISENBERG's character in this television show was a chemistry teacher who produced methamphetamine that dominated the drug market in the Southwest border.

4

18. CD#1 advised that REISER resides with his parents in Landenberg, Pennsylvania. A check of REISER's Pennsylvania driver's license shows that he has reported that he lives at 203 Skycrest Drive in Landenberg. CD#1 advised that REISER is extremely computer savvy and taught CD#1 how to use the message applications "Kik messenger" and "Privnote" to create self-destructing messages. CD#1 and REISER use these self-destructing messages to discuss and arrange the transfer of the parcels containing illicit substances from CD#1 to REISER.

19. CD#1 advised that he believes that REISER has sent five or six more packages that are to be delivered to Subject Address #1. REISER advised CD#1 of the fact that these parcels were to be delivered. Law enforcement intercepted one of these inbound parcels, Subject Parcel #1, and CD#1 had already received one of these parcels, Subject Parcel #2. Law enforcement conducted a search of United States customs records and located records substantiating CD#1's statement that there are incoming international parcels that are addressed to Subject Address #1 in Delaware.

20. Law enforcement conducted a search of various law enforcement databases regarding international shipments addressed to Vaughan R. REISER at 203 Skycrest Drive, Landenberg, Pennsylvania, 19350. These searches revealed REISER received international shipments at this location in late 2017. The manifests for these shipments include descriptors such as "machinery accessories" and "inert excipients." Your affiant knows that inert excipients are inactive ingredients added during the manufacturing process of controlled substances such as tablets and capsules. Through your affiant's training, experience and knowledge, your affiant is aware that individuals engaged in narcotics pill production commonly import pill press equipment in separate shipments in an effort to avoid detection from law enforcement.

21. On December 21, 2017, law enforcement removed the fentanyl from Subject Parcel #1 and Subject Parcel #2 and replaced the fentanyl with a sham substance similar in appearance to fentanyl.

22. On December 21, 2017 and December 22, 2017, under the supervision and control of law enforcement, CD#1 contacted REISER via Kik messenger. On December 22, 2017, CD#1 and REISER made arrangements for CD#1 to come to REISER's house, located at 203 Skycrest Drive in Landenberg, Pennsylvania, for CD#1 to deliver Subject Parcel #1 and Subject Parcel #2 (containing the sham substance similar in appearance to fentanyl), and for CD#1 to receive illicit pills from REISER. On December 22, 2017, prior to meeting with REISER, CD#1 and his vehicle were searched by law enforcement and found to be free of money and/or a controlled substance. CD#1 was then provided Subject Parcel #1 and Subject Parcel #2. CD#1, while under surveillance, travelled directly to REISER's residence at 203 Skycrest Road in Landenberg, Pennsylvania.

23. On December 22, 2017, at approximately 11:32 AM, CD#1 and REISER met inside CD#1's vehicle, which was parked outside of REISER'S residence located at 203 Skycrest Drive, Landenberg, Pennsylvania, 19350. Prior to entering CD#1's vehicle, REISER was observed exiting the residence of 203 Skycrest Road and directly

5

proceeding to and entering CD#1's car. Inside the vehicle, CD#1 gave REISER Subject Parcel #1 and Subject Parcel #2. In return, REISER gave CD#1 two parcels and told CD#1 that the parcels contained Adderall pills. At approximately 11:37 AM, law enforcement observed REISER exit CD#1's vehicle and walk directly to and enter his home at 203 Skycrest Drive, Landenberg, Pennsylvania, while carrying Subject Parcel #1 and Subject Parcel #2.

24. CD#1 thereafter left the vicinity of 203 Skycrest Drive and proceeded directly to a prearranged location where he was met by law enforcement officers. CD#1 turned over to law enforcement the two parcels containing the purported Adderall pills he had received from REISER. The purported Adderall pills were tested by Tru-Narc. The Tru-Narc identified the purported Adderall pills as methamphetamine. There were approximately 1,000 pills marked AD30. CD#1 and his vehicle were again searched by law enforcement and found to be free of money and/or contraband.

25. On December 22, 2017, at approximately 3:15 PM, law enforcement observed REISER depart 203 Skycrest Drive in a white Subaru. Officers followed REISER's vehicle for a few miles until it was safe to conduct a traffic stop of the vehicle. REISER was removed from the vehicle and he, along with the white Subaru, were transported to 203 Skycrest Drive. On December 22, 2017, at approximately 3:30 PM, a federal search and seizure warrant was authorized for REISER'S residence at 203 Skycrest Drive, Landenberg, 19350. At approximately 3:35 PM, HSI special agents and PSP troopers executed this search warrant and entered the premises.

26. Once inside 203 Skycrest Drive, officers observed and seized at least 70,000 counterfeit controlled substance pills, suspected bulk fentanyl, and a small, indoor hydroponic marijuana grow operation. Officers also recovered Subject Parcel #1 and Subject Parcel #2. Officers seized numerous electronic devices that were utilized to operate REISER'S online drug distribution network. Law enforcement also seized various documents that contained user names, passwords, and ledgers that showed REISER purchased and sold controlled substances on dark net market sites which function as black markets, selling or brokering transactions involving drugs, cyber-arms, weapons, counterfeit currency, stolen credit card details, forged documents, unlicensed pharmaceuticals, steroids, other illicit goods, as well as the sale of legal products. Officers seized numerous sealed USPS parcels containing counterfeit pills with postage affixed to them. The aforementioned parcels did not contain a recipient's address only a number and a letter. REISER used a key code ledger that corresponded with the parcel's content and type of counterfeit pills based upon the number and letter. REISER would address each parcel with the recipient's name and address after receiving an order for a specific number and type of counterfeit pills. RESIER's parcels were organized in an efficient pre-packaged matter allowing him to quickly drop a customer's order into the mail system after it was addressed to a recipient.

27. On December 22, 2017, at approximately 9:30 PM, REISER advised he wanted to speak with law enforcement. Under the supervision of law enforcement, REISNER transferred a Bitcoin account containing narcotics proceeds to the United States government.

REISER utilized an advanced computer operating system to transfer approximately 8.9 Bitcoin, worth approximately $125.000 at that time, to a government controlled Bitcoin wallet.

28. On December 22, 2017, officers interviewed REISER. REISER was provided his written Miranda warnings and waived the same. REISER admitted that he was a buyer and vendor on dark net websites. He explained that he had a business partner by the name of Stephen STROH and they have been conducting their illegal drug trafficking business together since the spring of 2017. RESIER told agents that STROH resides at 56 Morton Avenue. REISER stated STROH is a family friend (describing him as being similar to an uncle) and that he was in his early 50's. Law enforcement databases revealed that Stephen David STROH resides at 56 South Morton Avenue, Apartment A10, Morton, Pennsylvania.

29. REISER explained to agents that he utilized several individuals to receive international parcels containing fentanyl, alprazolam, pill binders and domestic parcels containing methamphetamine that he purchased from dark net vendors. REISER also advised that he utilized some of these individuals to receive pill presses, mixers and pill dies. REISER would collect the unopened parcels from these individuals and transport them to STROH. REISER advised that he and STROH would take these parcels containing illicit controlled substances to a unit within a warehouse located at 100 Mill Street, Clifton Heights, Pennsylvania (hereinafter "the warehouse"). REISER advised that inside of the warehouse were the previously imported pill presses, mixers and equipment that they needed and used to manufacture the counterfeit pills. REISER advised that when he was recently in the warehouse, there were approximately four kilogram of methamphetamine as well as pill binders. REISER and STROH would utilize respirators and protective suits to extract the controlled substances from the unopened parcels and mix it with other chemicals necessary to press the pills. REISER explained that STROH conducted his own research and learned how to create the pill recipes and manufacturing process. REISER followed STROH'S instruction and explained their relationship was similar to Jesse Pinkman (REISER) and Walter White a/k/a HEISENBERG (STROH) in the fictional television show Breaking Bad.

30. REISER stated that STROH was responsible for post pill production and that STROH would vacuum seal the pills and place them in Mylar bags. REISER advised that STROH conducted this at STROH's apartment located at 56 South Morton Avenue, Apartment 10, Morton, PA. REISER would pick up the pills from STROH at STROH's apartment. REISER advised that when he has gone to STROH's apartment, he has observed pills inside of five-gallon paint buckets within STROH's home and also within STROH's minivan. During the execution of the search warrant at REISER'S house, agents found pills packed in the same manner that REISER described.

31. REISER identified the warehouse to law enforcement. Your affiant contacted the realty responsible for leasing units at the warehouse and confirmed that Stephen STROH was the leaseholder for Unit 23 at 100 Mill Street.

32. On December 23, 2017, HSI Special Agents and PSP Troopers executed a search warrant at 100 Mill Street, Unit 23, in Clifton Heights. Law enforcement located three pill presses, two pharmaceutical mixers, approximately 450 kilograms of binding agents, approximately 50 kilograms of controlled substances including powdered fentanyl (field tested positive for the presence of fentanyl), suspected methamphetamine, suspected alprazolam, and other unidentified powders.

33. On December 23, 2017, HSI special agents and PSP troopers simultaneously executed search and seizure warrants at STROH'S residence located at 56 South Morton Avenue, Apartment 10, Morton, Pennsylvania and the warehouse located at 100 Mill Street, Unit 23, Clifton Heights, Pennsylvania. STROH was inside of his apartment at the time of the execution of the warrant.

34. On December 23, 2017, STROH was provided his written Miranda warnings and waived the same. STROH also signed a written consent form for law enforcement to search a second pill lab located in Kennett Square, Pennsylvania. STROH advised the agents that this second lab contained a pill press, fentanyl and methamphetamine in powder form, and counterfeit pills. STROH admitted that he and REISER manufactured counterfeit pharmaceutical pills at the warehouse located at 100 Mill Street, Unit 23, Clifton Heights, Pennsylvania. He stated that they produced counterfeit Oxycodone capsules containing fentanyl, Adderall capsules containing methamphetamine, and Xanax capsules containing alprazolam. STROH knew that the counterfeit pills contained the aforementioned controlled substances. STROH advised that he and REISER had produced approximately 100,000 counterfeit Oxycodone pills, 60,000 counterfeit Adderall pills, 30,000 counterfeit Xanax pills. STROH further advised that he and RESIER sold these pills via the dark net, selling that Oxycodone pills for $3 per pill, the Adderall for $1 per pill, and the Xanax for $.50 per pill. STROH learned about counterfeit pill production from an inmate he befriended while he was serving time in state prison for a prior conviction. The inmate explained to STROH that he could make a substantial profit by producing heroin pills. A search of the Pennsylvania Unified Judicial System confirmed that STROH has served time in prison for running/managing a house of prostitution and related offenses.

35. STOH advised that after he was released from prison, he was approached by REISER and the two agreed to form a partnership in which they would sell counterfeit pills on dark net market places. STROH advised that REISER provided STROH with the recipes to mix the counterfeit pills. STROH stated that RESIER completed research on dark net websites to learn how to manufacture the counterfeit pills. Upon learning this information, STROH and RESIER conducted multiple dry run operations to ensure the consistency of the manufactured pills.

36. STROH and his siblings received a substantial inheritance after their mother has passed away. STROH admitted to agents that he utilized some of the inheritance to begin his pill press operation with RESIER. STROH estimated that the warehouse in Clifton had approximately $30,000 of his own money invested in it. Agents advised STROH that officers conducing the search warrant found a bank check for $100,000. STROH claimed

that his brother gave him the check earlier the same day. STROH told agents that REISER'S father called him earlier that day to tell STROH about REISER'S arrest. REISER'S father asked if STROH had any involvement with REISER'S arrest related to fentanyl possession. STROH denied any involvement with REISER'S activities. STROH told the agents that he expected to be arrested and figured that law enforcement was coming for him. STROH contemplated fleeing to Mexico.

## **CONCLUSION**

37. Based on the above, there is probable cause to believe that from in or about the spring of 2017 to on or about December 23, 2017, Stephen David STROH and others conspired to distribute a mixture and substance containing 400 grams or more of fentanyl, a mixture and substance containing methamphetamine, Schedule II controlled substances, and other controlled substances, in violation Title 21, United States Code, Sections 841(a)(1) and 846.

William Capra, Jr.
Special Agent
Homeland Security Investigations

Sworn and subscribed before me this  26  day of December, 2017.

HONORABLE JACOB P. HART
*United States Magistrate Judge*